

J. Royall Tippett, Jr., of Baltimore, Md.,
for plaintiff.

Randolph Barton, Jr., and F. Fulton
Bramble (of Barton, Wilmer, Bramble, Addison & Semans), both of Baltimore, Md.,
and Carl A. Person, of New York City, for
defendant.

CHESNUT, District Judge.

This is a patent case of an unusual nature. It does not involve any question of
infringement or validity of patents, but of
ownership. The suit has taken the form
of a request for a declaratory judgment
that certain United States patents recently
issued to the plaintiff do not equitably belong to the defendant, under a contract between the parties dated October 28, 1931.
By the terms of this contract, the plaintiff
sold and assigned to the defendant for $50,-
000 certain applications for United States
letters patent, on which two patents were
subsequently issued; and by the terms of
the contract the plaintiff agreed to transfer
or assign, without further consideration,
any future patents obtained by him relating
to those sold or which might compete with
them. The more particular terms of the
contract in this respect will be later stated.

The suit was originally instituted by the
plaintiff in a Maryland State court under
the provisions of the Maryland Declaratory
Judgment Act. See Flack's Annotated Md.
Code of 1939, Art. 31A. On the grounds
of diverse citizenship, the defendant removed the case to this court. The declaratory judgment statutes of the State of
Maryland and of the United States (for
the latter, see 28 U.S.C.A. § 400) are quite
similar, and no procedural or jurisdictional point is presented by the case, which has
been submitted after final hearing on the
pleadings and testimony and argument of
counsel.

*I make the following findings of relevant
and controlling facts of the case.* The
plaintiff is a resident of Baltimore City,
Maryland, about sixty years of age, and
has been engaged for a period of about
forty years in photographic reproduction
engineering. The defendant is a Delaware
corporation with principal offices in New
York City, but having ten or more plants
in different cities and states of the United
States. Its principal business is the manu-

facture and sale of ink, but it also makes and sells machinery of certain kinds having some relation to printing and lithographing.

On May 22, 1930, Ogden and the General Printing Ink Corporation entered into a written contract which recited that Ogden had invented and applied for letters patent on a photographic lettering machine, one of the claims of which invention read as follows:

"In a photographic lettering machine, a projecting system for projecting images of letters on a sensitized medium, an adjustable make-up table, a second projecting system for projecting images of said letters to view on said make-up table, and means for moving the sensitized medium and make-up table so that the images of the letters may be projected on said sensitized medium in proper spaced relation to each other and to the entire composition."

The contract further provided: The Ink Corporation decided to acquire the invention if the same proved patentable. Ogden was paid $10,000 and transferred to The Ink Corporation certain machines embodying the invention, and granted to The Ink Corporation exclusive license to make and sell the inventions and any future inventions relating to photographic lettering machines. Ogden also gave The Ink Corporation an option to purchase the inventions for $50,000 in cash, the $10,000 presently paid to be credited thereon. Ogden was employed for one year to aid in the manufacture, sale and demonstration of the invented machines at a salary of $10,000 plus a royalty of $250 for each machine sold.

On October 8, 1931, Ogden and The Ink Corporation entered into a subsequent written contract, the proper construction and application of which constitutes the ultimate matter for adjudication in this case. By this contract, The Ink Corporation exercised the option given in the earlier contract to purchase Ogden's invention referred to for $40,000 in addition to the $10,000 previously paid, and Ogden absolutely assigned four patent applications to The Ink Corporation. They were "Application Serial No. 148,367 filed November 15, 1926; Application Serial No. 313,984 filed October 22, 1928; Application Serial No. 419,775 filed January 10, 1930; and Application Serial No. 136,437 filed February 20, 1926"; and Ogden also assigned his interest in the inventions, processes, trade secrets, formulae, machines, and devices set forth in the applications "or in any way related to those set forth therein, and all additions, improvements or modifications relating to or concerning such inventions, etc." Ogden also assigned the drawings, patents, machinery, furniture and fixtures, and good will of the business of manufacturing, selling and dealing in "photographic lettering machines". The later agreement superseded the earlier one and the later agreement made no provision for continued employment or royalty to Ogden. He also agreed (1) to convey to The Ink Corporation rights in "developments, improvements, modifications or additions of or to or in any way relating to the above described inventions", which he might later invent, describe or control, during the life of any patent or patents granted upon the described applications; (2) during the life of any such patent to assign future inventions or patents therefor for devices "intended to perform work, or produce results similar to those which the machines, inventions, processes or devices sold by Ogden to the General Printing Ink Corporation were intended to perform or produce; (3) to also assign new devices, processes and machines calculated or intended to compete or capable of competing with those sold, whether improvements on the latter or independent inventions, and whether or not the new inventions infringed upon the old; (4) that he would not, during the life of any of the patents or applications therefor sold, deal in any inventions, machines or devices which would compete with or were intended to compete with or capable of competing with any of the inventions sold; (5) that he should disclose any such new related or competing inventions or improvements to the General Printing Ink Corporation, but not to others.

The seventh paragraph of this latter agreement provided as follows:

"That the words 'Process' or 'Processes' wherever used in this agreement shall be limited in their applications to the subject matter or matters of the thing herein conveyed or agreed to be conveyed, and are intended to apply to any means or methods of accomplishing the results described in said applications for letters patent or capable of being produced by the inventions, machines and devices described therein."

Ogden had expended over $50,000 in the development of the invention sold to The Ink Corporation.

Although the contract of October 28, 1931, made no provision for the continued employment of Ogden, or for any interest by way of royalty or otherwise in the inventions sold, he continued for some little time to be connected with the General Printing Ink Corporation in the sale of the invented machines. After he left its employment, he began to devote his attention to the development of new processes for a device in the field of industrial printing which would produce the copy therefor by the use of photography in substitution for the present methods of type composition known as Monotype or Linotype, by which metal type is required. His thought was to perfect machinery whereby the printer's copy could be developed, for subsequent reproduction, without the use of metal, but by photography. The general idea was not new, but the mechanical means therefor, for commercial use, had not been previously perfected. The state of the art up to that time is expressed in a book entitled, "Printing in the Twentieth Century", being a reprint from a special number of "The London Times" of October 29, 1929, wherein it was stated:

"The idea of composing textual matter for printing without the use of type has long been the dream of many inventors. The progress of photo-lithography through the growing importance of the offset process directed fresh attention to the subject, because it was strongly felt that it ought not to be necessary to set up a forme of type simply to pull proofs for reproduction by the photo-lithographer. This led various inventors to attack the problem on the lines of combining the typewriter keyboard with the camera so as to compose the 'copy' by passing the letters before the lens on striking the keys, and by other mechanism to provide for spacing and justification. Of the numerous ideas put forward only three have been carried to a stage showing promise of ultimate practical usefulness."

In 1932 and again in 1935, Ogden conferred with the president of the General Printing Ink Corporation regarding his new idea with the purpose of interesting the Ink Corporation financially in the development and exploitation of the proposed new machinery, but the latter declined to take any interest in the matter. Nothing was said at the time as to whether The Ink Corporation would claim any rights in and to the invention, if perfected, under its contract. Ogden testified that the president said that the new idea was out of The Ink Corporation's line as it made no machinery for general commercial printing. The president denied the fact of the 1932 interview. Subsequently the parties had correspondence at various times during the years 1936 to 1940, upon the same general subject. The tenor of this correspondence was that Ogden was still trying to interest The Ink Corporation to aid him in financing and exploiting the new ideas on which he had worked over a period of several years and on which he has personally expended over $9,000 and incurred additional obligations of more than $3,000. The Ink Corporation declined to advance any moneys or incur any obligations in the development of the project; but nevertheless, it would not disclaim its possible right to have an assignment of the patents along this line which might be issued to Ogden. On several occasions, Ogden has tentatively interested others in financing the project, but their support has been withdrawn upon learning that the General Printing Ink Corporation may claim the right to and benefits from the inventions if successfully perfected. In the meantime, Ogden has obtained the issuance of two patents covering his new invention. They are United States letters patent Nos. 2,207,265 and 2,207,266. The resultant situation is that Ogden, himself without necessary financial means to develop the new invention, is unable to procure the financial assistance from others by reason of the claim of the General Printing Ink Corporation that it is or may be entitled to the inventions when perfected. The plaintiff has, therefore, brought this suit to obtain a judicial determination of the question of the respective rights of the parties in and to these two new letters patent. The position of the defendant as stated by its representatives as witnesses in the case is that they regard the patents as of no commercial value in the field of general printing, but fear any waiver or release of its claims to the patents under its contract might result in adverse competition in the field of the inventions which they bought from Ogden and with which he agreed not to compete. Subsequent to the purchase of the patent applications, two patents have been issued thereon, being United States letters patent Nos. 1,893,439 and 2,010,561; and pursuant to the terms of the contract, Ogden has also assigned to The Ink Corporation a third subsequent patent relating to the same subject matter, patent No. 1,980,287.

I find from the evidence in the case that the inventions sold by Ogden to the General Printing Ink Corporation related to a hand-operated photographic art lettering machine, the operation of which requires artistic skill and training and the process is similar to that of an engraver. I find also that the patents in dispute—to wit, Nos. 2,207,265 and 2,207,266 recently granted to Ogden—are in a different economic field in that they cover a mechanically operated machine which produces type photographically at the speed required in modern printing and may be operated by anyone familiar with a standard typewriter keyboard; and that said invention is materially different from the inventions previously sold by Ogden to The Ink Corporation and is not an improvement upon the inventions so sold, nor capable of competing with them, in the sense of the contract. The invention sold is one which covers a hand-operated and adjusted art lettering machine, such as is used on commercial letterheads and other artistic printing work, while the patents in dispute relate to a rapid keyboard operated photographic typesetting machine, the product of which is a printed page with lines and spaces adjusted. The average labor cost per word in production of copy by the invention sold by Ogden is about one dollar, which compares with the average of a fraction of a cent per word in ordinary commercial printing. The cost of the machine for art lettering is about $2,500, while it is expected that the cost of the machines under the new patents to Ogden will be only several hundred dollars.

The conclusion of law is that Ogden, the plaintiff, is not required by the terms of the contract of October 8, 1931, to convey the United States letters patent in question—to wit, Nos. 2,207,265 and 2,207,266—to the defendant; and the plaintiff is entitled to a declaratory judgment to that effect.

The ultimate question in the case is the proper construction of the contract; and the application of its wording to the subject matter of the respective patents. An examination of the later Ogden patents, and comparison with the former, shows at once, even to one not a patent expert, that they cover quite different mechanical inventions. It is true that they have certain similarities of function, particularly in that both comprehend the photographing of letters from a master plate; but the method of operation by which this is done, and the purpose to be served by the respective machines, are very different. The mere photographing of letters was not a novelty before any of these patents were applied for. The validity of the patents respectively is not an issue in this case, but it will be seen that all of them relate to particular forms of machinery to accomplish quite different purposes in the general field of the graphic arts. Patents Nos. 1,893,439 and 2,010,561 relate to a particular type of photographic lettering machine. It was apparently not practicable to furnish the court with a working model of the machines, and an examination of these two patents shows that they are of intricate mechanical design; but it will be sufficient for the purposes of the case to describe the machine generally. It consists essentially of a master alphabet plate with a light projecting device whereby the respective characters can be visually reproduced on a so-called "layout table", and there seen by the operator, who by adjustments of the machine can arrange the image of the selected letter in any desired position on a sheet of paper and can successively arrange in spaced relationship thereto other selected letters from the master alphabet; and then the letters so selected and spaced in relation to each other can be photographed by a camera which constitutes a part of the whole machine. In the patent No. 1,893,439, this is briefly expressed in the specifications as follows:

"The invention provides a photoprinting machine which selectively exposes to view images of successive portions of a matter to be composed and which is also adapted to photographically fix corresponding successive images upon a sensitized surface.

"The invention further provides a device which will project upon a predetermined portion of a layout surface in selected spaced relationship images of successive elements of a composition and which will photographically fix a succession of similar images upon a corresponding portion of a sensitized surface in accordance with said spaced relationship."

The specifications also provide (page 11, lines 48 to 59):

"It should be noted that through the agency of the present invention a simple and inexpensive set of master characters can be utilized from which any selected degree of photographic enlargement or reduction within predetermined ranges can be

produced. It should also be observed that by means of a plurality of such sets of master characters having different styles of letters designated thereon, a great variety of fanciful and selective compositions can be effected at very little cost."

This invention is in the field of art lettering. Its purpose and utility are to facilitate the composition of lettering and words for subsequent printing by rendering it unnecessary for the artist to personally prepare by pen or pencil the particular letter to be reproduced, but still allowing full play for artistic selection, arrangement and spacing of previously formed letters. In practice, the image of the selected letter is projected upon the sheet on the layout table so that it can be positioned, spaced and arranged with reference to other letters in the way that it is desired it will appear in the final copy. While it appears the machine can be used to photograph the letters directly without projection upon the layout table, it is obvious that what is ordinarily desired is a highly selective arrangement and spacing of the respective letters. This is the ordinary functioning purpose of the machine. It is apparent that its utility consists in the ability to select particular letters and space and arrange them in a desired artistic manner, without the necessity of manually reproducing each of the letters. Thus in operation the machine facilitates artistic composition. The range of the machine is also such that even a monogram can be produced. Its main purpose is to compose for reproduction an artistic arrangement of lettering for advertisements, letterheads, or other similar matter having a more distinctive and attractive appearance than could be secured by ordinary printing.

An examination of the recent Ogden patents here in dispute discloses an invention of a materially different type from the photo-lettering machine device and patents therefor sold by Ogden to The Ink Corporation. The invention comprehended by the patents in dispute is for industrial type composition by photography. It is designed to achieve the same results now produced by the Monotype or Linotype method, but without the use of metal type. · Two machines and two operations are provided for —one covered by each of the patents in dispute. Patent No. 2,207,265 is for the original composition of the matter to be ultimately printed; while patent No. 2,207,266 is an especially devised machine for the so-called "justifying" of the originally produced lines which, as in the operation of the typewriter, frequently are of irregular length. That is to say, after the copy is first produced, it is necessary to re-space the words in some lines in order to make the lines of predetermined equal length.

The machine used for the original composition, although highly detailed and seemingly complex in the description contained in the patent, may be sufficiently and briefly described as follows. A selected master alphabet, in arcuate form, is connected to a keyboard similar to that of the ordinary typewriter. The depression of the respective keys throws the selected letter into the field of operation of a camera by which it is photographed on a sensitized medium. The operation of the keyboard in connection with the camera produces copy much like that of an ordinary typewriter. This particular procedure of itself was not novel, but the patentable features of the invention consist in part in improvements in the general process. One of the novel features of the particular machine is an improved and interchangeable master type slide requiring a minimum amount of space for storage, and dispensing with the necessity of large and costly founts of metal type. The reproduction of the copy by photography also enables the operator of the machine to vary the size of the letters reproduced from the master type slide; and a further improvement relates to the adjustment of the spacing between the characters in accordance with the particular type slide used.

The second machine is devised for the purpose of "justifying" lines of the original copy. It is a novel device, the absence of which heretofore, it is said, has prevented the successful substitution of photographic production of printer's copy for the presently used Linotype method of composition. The word "justifying" is one used in the particular trade or art to designate the process of re-spacing lines to an even length. It is obviously used in the sense of adjusting or rectifying the length of the lines. The patent description of the machine which it is said accomplishes the "justification" is very elaborate and detailed; but it will be sufficient for an understanding of the main features of its operation to say that in setting up the copy, justifying dots are made below the line at each space between words; and in the process of justification, the mechanism is actuated by a photoelectric cell, the energization of which is controlled by the passage

thereof over one of the dots. By this mechanism, the machine scans the line to be re-spaced. After the matter has been originally composed and subsequently justified by photography, a final copy for the printing plate may be made in the usual manner —as, for example, by suitable photo-etching, photolithographic or offset processes.

A comparison of the patents sold by Ogden and those later invented very clearly shows that they are of quite different mechanical operation and functioning and are designed to produce quite different results. The chief characteristic of the former is the production of artistic lettering, while the functioning of the latter is to produce ordinary industrial printing. The former facilitates the kind of work ordinarily done by an engraver, while the latter is intended as a substitute for the composition of printed matter now done by the Linotype. It is evident that they are in different fields of the graphic arts. It cannot reasonably be said that they compete one with another as they are in different economic fields of work.

■■ The ultimate question of law in the case is whether the later patents can be said to be improvements on the former or to compete with the former or whether they in any way "relate" to the former as this wording is used in the contract. It is obvious that the later patents are not improvements on the former. Allison Bros. Co. v. Allison, 144 N.Y. 21, 38 N.E. 956. I think it equally clear that they cannot be said to compete with the former patents for the reasons already stated. Possibly a closer question in the case is whether the later patents can be brought under the contract provision which requires Ogden to assign to The Ink Corporation subsequent patents in any way "relating" to those sold. The language is, indeed, literally broad and sweeping, but it must be interpreted from the context in which it is found, having regard to the particular subject matter and the relations of the parties. The situation out of which the contract arose was that Ogden had perfected a photo-lettering machine for the production of artistic lettering, and was engaged in the business of producing and selling machines therefor. This business had cost him in capital outlay over $50,000. He apparently was without sufficient financial means to satisfactorily further exploit the invention, and thereupon sold the business and its tangible and intangible elements of value, including the patent rights, to The Ink Corporation. The latter in turn was, of course, desirous of protecting the business from subsequent competition by Ogden or others. The contract, therefore, provided in rather extensive and meticulous detail against such possible competition, and restrained Ogden directly from re-entering the business, and further provided that any subsequent inventions made by Ogden relating to the same subject matter should be conveyed by him to The Ink Corporation. It is important to keep in mind that the thing sold was a particular invention for a special purpose and involved a particular type of machine to accomplish that purpose. The contract did not provide for continued employment of Ogden by the defendant and also made no provision for further compensation to Ogden with respect to future inventions, or even reimbursement to him for his expenses in perfecting them. In this situation, it is not reasonable to construe the broad general language of the contract as imposing a blanket restriction upon Ogden's inventive genius in fields which would not commercially compete with the particular invention sold by him to the defendant. The rule of construction in such cases is succinctly stated in Williston on Contracts, Rev.Ed., volume 5, section 1643A, page 6414—"The governing rule in this class of cases is that where the product of an inventive mind is sought to be appropriated under an agreement to assign to another, the language of the agreement must be clear and show an unmistakable intention that the particular matter covered by the invention or patent is within the intention of the parties. See, also, Aspinwall Mfg. Co. v. Gill, C.C., 32 F. 697, 700.

Counsel for The Ink Corporation refers to Flakice Corp. (Delaware) v. Short, 2 Cir., 115 F.2d 567, as an authority supporting his position. The court there considered a somewhat similar patent assignment contract, and reached the conclusion that a subsequent patent was properly within the scope of the wording of the contract. I am quite in accord with the principle of construction and application announced in the opinion, but the relationship of the patents there involved was clearly different from that existing in this case.

Counsel may submit a form of declaratory judgment in accordance with the conclusion announced herein.