**NEW BRITAIN MACHINE CO., Plaintiff-Appellant,**

v.

**W. Lloyd YEO, Administrator, Estate of Joseph H. Hoern, et al., Defendants-Appellees.**

**W. Lloyd YEO, Administrator, Estate of Joseph H. Hoern, et al., Plaintiffs-Appellees,**

v.

**NEW BRITAIN MACHINE CO., Defendant-Appellant.**

**Nos. 16211, 16287.**

United States Court of Appeals Sixth Circuit.

March 8, 1966.

Roy C. Hopgood, New York City, and Palmer S. McGee, Jr., Hartford, Conn., for New Britain Machine Co., Milton E. Higgs, Higgs & Higgs, Bay City, Mich., on the brief, John M. Calimafde, Arthur M. Lieberman, Hopgood & Calimafde, New York City, Palmer S. McGee, Jr., Day, Berry & Howard, Hartford, Conn., of counsel.

Ferdinand D. Heilman, Saginaw, Mich., for W. Lloyd Yeo and others, Heilman, Purcell, Tunison & Cline, Saginaw, Mich., on the brief.

Before PHILLIPS and CELEBREZZE, Circuit Judges, and CECIL, Senior Circuit Judge.

HARRY PHILLIPS, Circuit Judge.

Case No. 16,287 is an appeal by New Britain Machine Company (referred to herein as "New Britain") from a final judgment rendered against it in the amount of $202,253.51, plus costs and disbursements yet to be taxed. This judgment is based upon royalties on a certain "BV" machine manufactured and sold by New Britain, which uses mechanisms covered by U. S. Patent No. 2,872,-853 (application No. 400,531). Plaintiffs-appellees (referred to herein as "Yeo et al.") are a group of twenty-four former stockholders of Hoern & Dilts, Inc., a Michigan corporation which was dissolved in 1955, and are the owners of the aforesaid patent as assignees of this corporation.

Case No. 16,211 is an appeal by New Britain from an order of the district court dismissing its action against Yeo et al. for the recovery of royalties alleged to have been paid by mistake and without consideration in the amount of $207,193.-36.

Jurisdiction in both cases is based upon diversity of citizenship. This opinion will be devoted to case No. 16,287 except where otherwise indicated.

*1) The three contracts at issue*

This action is for breach of contract. Three contracts are involved, referred to herein as the 1946 contract, the 1950 contract and the 1955 contract. The patent in question, No. 2,872,853, was issued to J. H. Hoern, inventor, February 10, 1959. The application for this patent

was filed by Mr. Hoern December 28, 1953.

New Britain is a manufacturer and seller of industrial machines. The machine here in question is of a type known as a rotary-cam actuated boring machine. This type of machine falls generally into one of three classes, namely: (1) "indexing" machines, or (2) "continuous" machines, or (3) "non-indexing, non-continuous" machines. The BV machine here involved is of the third class, i. e., "non-indexing, non-continuous."

In 1946 and prior thereto J. H. Hoern and Carl E. Dilts were engaged in business as a partnership designing and building machine tools. Mr. Hoern is now dead and Yeo is the administrator of his estate.

### The 1946 Contract

On March 28, 1946, these two individuals entered into a licensing agreement with New Britain. This contract stated that the licensors, Hoern and Dilts, "have been and now are developing cam and pneumatic actuated type boring machines;" that certain improvements in cam and pneumatic actuated type boring machines were disclosed in patent application No. 642,352 (later granted as Patent No. 2,641,146) and in application for U. S. Patents then in course of preparation (this reference is to application No. 671,477 which was filed May 22, 1946, and for which the patent was issued November 24, 1953, as No. 2,659,961); and that the exclusive right and license to manufacture and sell the said boring machines was granted to New Britain, except in certain particulars therein provided.

The pertinent licensing language of the 1946 contract is quoted in the margin.[1]

Additionally the agreement provided that Hoern and Dilts would disclose to New Britain any invention or improvements relating to the said machines, without further royalty payments.[2]

1. "1. Licensors, individually and collectively, agree to and do hereby grant unto The New Britain Machine Company, its successors and assigns, the exclusive right and license to manufacture, and sell said boring machines as aforesaid, including improvements thereto as shown, described and claimed in U. S. Patent Application Serial No. 642352, filed 19th day of January, 1946, and in said Patent Applications now in course of preparation, and agree to and do hereby grant to Licensee, its successors and assigns, the exclusive right and license to manufacture and sell machines under any Letters Patent owned or controlled by Licensors, or either of them, which may be granted on applications now or hereafter filed, and disclosing improvements on or relating to said boring machines and similar machines. It is expressly understood by the parties hereto that Licensors do hereby grant an exclusive license to Licensee to manufacture and sell machines covered by this Agreement and that title to said Patent Application, applications now in course of preparation, and any future applications as well as the related patents, when granted, all remain the property of Licensors who retain all rights thereunder not granted to New Britain by this Agreement, including among other things the right to design, manufacture, use and sell the Chapman continuous turning machine now in production; and also special purpose machines, the functions of which are beyond the scope of the boring machine covered by this Agreement and which embody any or all the features incorporated in the machines of the type described on blue print T300 annexed hereto and made a part hereof or incorporate any of the patent and design features which are included in the Patent Application No. 642352 and said patent applications in course of preparation. Licensors further agree that if they develop said special purpose machines they will not license any other manufacturer to manufacture or sell said machines."

2. "Licensors, individually and collectively, agree to disclose promptly to Licensee any inventions, new designs, or methods of production in or relating to boring machines made or owned or controlled by them or either of them, and to render all possible assistance to Licensee in securing for Licensors, at Licensee's option, patents or other protection on such inventions, designs, and methods and to grant and do thereby grant to Licensee licenses under such secured patents without further royalty payments by Licensee, the expense of such attempts at securing patents or other protection to be borne by Licensee."

In September 1946, the Hoern and Dilts Corporation, hereinafter referred to as "H & D, Inc.", was formed, with Messrs. Hoern and Dilts holding a majority of the stock. H & D, Inc. engaged in the manufacture and sale of "indexing" and "continuous" rotary cam actuated boring machines.

## The 1950 Contract

In 1950 New Britain discovered that H & D Inc. was also engaged in the manufacture and sale of a type of "non-indexing, non-continuous" boring machines. New Britain protested to the individuals and the corporation that this action was an infringement of the exclusive rights granted by the 1946 contract. Two new agreements were executed, one between New Britain and H & D Inc., and the other between New Britain and Messrs. Hoern and Dilts as individuals. The agreement between the two corporations provided that:

"2. H & D agrees to cease forthwith and not to resume the manufacture or sale of Non-indexing Type Boring Machines of the general type heretofore manufactured and sold by it and which New Britain contends are covered by the said exclusive license which New Britain did acquire from Joseph H. Hoern and Carl E. Dilts by agreement of March 28, 1946."

The new licensing contract which was executed in 1950 between New Britain and the individuals Hoern and Dilts provided that the 1946 agreement "be amended by substituting therefor" the new agreement. The 1950 contract granted New Britain the exclusive license to manufacture and sell "said Rotary-Cam Actuated Boring Machines, including machines of the general type shown in Blue Print T-300 [3] annexed hereto," and including improvements thereto described and claimed in patent applications No. 642,352 and No. 671,477 (the same two applications mentioned in the 1946 agreement).

Pertinent parts of the 1950 agreement, which will be discussed later in more detail, are set forth in the margin.[4]

3. It is conceded that "the claims allowed in patent #2,872,853 (BV Machine) are not readable on Blue Print T-300."

4. "WHEREAS, Licensors have been and now are developing Rotary-Cam Actuated Boring Machines, and certain improvements on said machines are shown, described and claimed in Applications for United States Patent, Serial Nos. 642,-352 and 671,477; and

"WHEREAS, Licensors did on March 28, 1946, enter into a written agreement with Licensee granting to Licensee the exclusive right and license to make and sell said Rotary-Cam Actuated Boring Machines, except for some rights retained by Licensors; and

"WHEREAS, Licensors represent that except for the exclusive license of March 28, 1946, they have granted no other license in conflict with the license herein granted, and therefore have the right to grant an exclusive license to Licensee to manufacture and sell said Rotary-Cam Actuated Boring Machines, except as hereinafter provided; and

"WHEREAS, Licensee is desirous of securing the exclusive right and license to manufacture and sell said Rotary-Cam Actuated Boring Machines, except as hereinafter provided, and Licensee is willing to pay for said exclusive right and license to manufacture and sell said Boring Machines; and

"WHEREAS, Licensors are willing to assist Licensee in every way possible in the manufacture and sale of said Rotary-Cam Actuated Boring Machines, including adaptation and application of such machines to customers' uses; and

"WHEREAS, certain conditions have arisen which make it desirable for both parties that said agreement dated the 28th day of March, 1946, between the parties hereto, be amended by substituting therefor the Agreement herein set forth,

"Now THEREFORE, in consideration of the premises and of the promises and agreements herein contained, IT IS AGREED between the parties hereto as follows:

"1. Licensors individually and jointly agree to and do hereby grant unto Licensee, its successors and assigns, the exclusive right and license to manufacture and sell said Rotary-Cam Actuated Boring Machines, including machines of the general type shown in Blue Print T-300 annexed hereto, and including improvements thereto, as shown, described and claimed in U. S. Applications Serial No. 642,352,

### The 1955 Contract

In 1955 New Britain purchased the assets of H & D Inc., and that corporation was liquidated. Two new agreements were entered into: (1) covering the purchase and sale of the assets of the liquidated corporation, which expressly reserved in H & D Inc. title to its patents and patent applications, and (2) a patent licensing agreement.

> filed January 19, 1946 and Serial No. 671,477, filed May 22, 1946, and agree to, and do hereby grant to Licensee, its successors and assigns, the exclusive right and license to manufacture and sell machines under any Letters Patent owned or controlled by Licensors, or either of them, which may be granted on applications now or hereafter filed, and disclosing improvements on or relating to said Boring Machines except that Licensors reserve unto themselves the exclusive right to manufacture, use and sell the Chapman Continuous Turning Machines now in production, and further reserve rights sufficient to enable them to grant to Hoern & Dilts, Inc., a Michigan Corporation, of Saginaw, Michigan, its successors and assigns, a non-exclusive license to manufacture, use and sell Rotary-Cam Actuated Vertical Indexing Type Boring Machines. It is expressly understood by the parties hereto that Licensors do hereby grant an exclusive license to Licensee to manufacture and sell machines covered by this agreement, and that title to said Patent applications and any future applications, as well as the related patents when granted, all remain the property of Licensors who retain all rights thereunder not granted to Licensee by this agreement.
> "* * * *
> "A 'Rotary-Cam Actuated Contour Type Boring Machine' shall be considered, for purposes of this agreement,
> "1. As one having two rotary feed cams arranged to impart to a tool carrier either successive movements in directions at an angle to each other or a compound movement, which is a movement in a direction which is the resultant of movements simultaneously imparted to said tool carrier by said two rotary feed cams, and
> "2. As one having two rotary feed cams arranged to impart to a non-rotatable work piece, a simple movement in one direction and to a rotatable tool a movement at an angle to the direction of movement on said work piece.

In the "Representations and Acknowledgement" section of the 1955 licensing contract, the parties identified various patents owned by H & D Inc., including the two patents referred to in the 1946 and 1950 agreements; and patent application No. 400,531 (later granted as No. 2,872,853), which is the subject of the present litigation.[5]

The granting clause of the 1955 contract is quoted in the margin.[6]

> "A 'Rotary-Cam Actuated Simple Type Boring Machine' shall be considered, for purposes of this agreement, as one in which each tool carrier is acted upon by only one rotary feed cam and is given only a reciprocating movement or a movement in only one direction.
> "* * * *
> "5. Licensors individually and jointly agree to disclose promptly to Licensee any improvements in rotary-cam actuated boring machines of the type herein licensed, made or invented by them, or either of them, and to render all possible assistance to Licensee in securing for Licensors, at Licensee's option, patents or other protection on such inventions, designs, and methods, and to grant, and do hereby grant to Licensee, licenses under such secured patents, the same as under the applications and patents herein identified, without additional royalty payments by Licensee, the expense of such attempts at securing patents or other protection to be borne by Licensee."

5. Paragraph 1(e) provides as follows:
   "(e) Licensor is the owner of the following United States of America Patent Applications which are now pending; to wit:
   "* * * *
   "Serial No. 400,531 filed December 28, 1953, relating to milling and boring machines."

6. *"Non-exclusive License.*—Licensor hereby gives and grants to Licensee a non-exclusive license for the life of *all of its letters patent and patent rights and all other rights in this paragraph (3) contained* to manufacture, use and sell throughout the world machines embodying mechanisms covered by any and all of the said letters patent and patent rights or by any applications now prepared and unfiled, or filed and for which no number has been issued, or covered by any modifications, changes or improvements to any machines, tools, or accessories now owned or hereafter acquired by Licensor, or covered by any drawings, designs, or speci-

Under the language of the 1955 contract quoted in footnotes five and six, patent application No. 400,531 (later granted as patent No. 2,872,853) is included within the term "letters patent and patent rights" upon which royalties were to be paid by New Britain, unless excluded by the "special acknowledgment" paragraph (footnote 7) which is discussed later in this opinion and unless included in the exclusive license granted to New Britain by the 1950 contract.

It is reemphasized that application No. 400,531 referred to in footnote 5 was later granted as Patent No. 2,872,853 on February 10, 1959. It is conceded by New Britain that the mechanisms of this patent are used in the BV machine involved in this litigation. The claim of Yeo et al. for royalties is based upon the use of patent No. 2,872,853 with respect to the BV machine.

New Britain contends, however, that the exclusive right to this patent was granted to it by Messrs. Hoern and Dilts under the terms of the 1946 and 1950 contracts and that this patent is excluded by the "special acknowledgement" paragraph of the 1955 contract (quoted *infra* in footnote 7); and it therefore owes no royalties on this BV machine under the 1955 contract.

## 2) Holding of district court

The case was originally tried at various sittings by the late District Judge Frank A. Picard, who died without announcing a decision. Following the death of Judge Picard the case was assigned to District Judge Stephen J. Roth. Thereupon by stipulation it was agreed that the case would be submitted to Judge Roth upon the transcript of the proceedings, arguments and briefs of counsel, and proposed findings of fact and conclusions of law.

In rendering a judgment against New Britain, it was the reasoning of the district court that, under the provisions of paragraph (1) (e) quoted in footnote 5, it was stated that at the time of the execution of the 1955 contract H & D Inc. was the owner of patent application Serial No. 400,531, filed December 28, 1953, which was then pending. Judge Roth emphasized that, after listing all the patents and patent applications then owned by H & D Inc., paragraph (1) concluded with this language:

"All of the letters patent, patent applications, licenses and other rights referred to in this paragraph (1) shall be referred to hereinafter in the aggregate and for convenience only as 'letters patent and patent rights.'" (See footnote 6).

fications relating to the so-called Hoern & Dilts machines, whether or not the subject of letters patent, including in such grant, without limiting the generality of the foregoing, but not limited to, the non-exclusive right to use any such mechanisms on any machines manufactured by Licensee, other than HOERN & DILTS machines; it being the intention of the parties hereto that Licensee shall have and hereby is acquiring a non-exclusive license *for the life of the said letters patent and patent rights and all other rights in this paragraph (3) contained* to manufacture, use and sell throughout the world and will pay royalties to Licensor upon any machines, tools or accessories embodying any of the mechanisms covered by any of the letters patent and patent rights or any other rights in this paragraph (3) contained which are now owned or may be subse-

quently acquired by Licensor under any applications for letters patent or under any engineering developments, designs, or specifications relating to the said HOERN & DILTS machines or any modifications, changes or improvements to any of the said HOERN & DILTS machines, whether or not the subject of letters patent." (Emphasis supplied.)

The term "letters patent and patent rights" as used in the above-quoted paragraph is identified in paragraph (1), which sets forth by number the various patents and patent applications owned by H & D Inc. Paragraph (1) concludes as follows: "All of the. letters patent, patent applications, licenses and other rights referred to in this paragraph (1) shall be referred to hereinafter in the aggregate and for convenience only as 'letters patent and patent rights.'"

The district judge then pointed out that "paragraph 3 provides for the licensing of the 'letters patent and patent rights'" owned by H & D Inc. and payment of royalties thereon by New Britain.

The court then concluded:

"The result urged upon the Court by the defendant would require two things: disregarding the plain and explicit language of the 1955 agreement between the parties and interpolating into the 1950 agreement between them, language which is not there.

"The Court finds that it was the agreement and the intention of the parties that the defendant pay royalties to Hoern and Dilts, Inc., on the 'BV' contour machine, which admittedly uses mechanisms covered by patent application number 400,531."

### 3) Is the BV machine within the scope of the 1950 contract?

New Britain contends that, under the terms of the 1946 and 1950 contracts, it acquired exclusive rights to *all* "non-indexing, non-continuous" machines for which Messrs. Hoern and Dilts then had applications pending, and all such machines for which Messrs. Hoern and Dilts thereafter might obtain patents; that the 1946 and 1950 contracts encompassed "non-indexing, non-continuous" machines broadly as a class; that the BV machine here involved falls within the grant of the 1950 contract, even though the application for the patent whose mechanisms are used in this machine was not filed until 1953 and the patent was not issued until 1959; and that the 1955 contract relates exclusively to "indexing" and "contin-

uous" machines, and not to "non-indexing, non-continuous machines" such as the BV machine here involved.

In support of this contention, New Britain relies strongly upon the "special acknowledgement" paragraph of the 1955 contract, which is set forth in the margin.[7]

This "special acknowledgement" language makes it clear that the 1955 contract was not intended to affect any rights which had been acquired by New Britain under the 1946 and 1950 contracts. If an exclusive license to patent No. 2,872,853 in fact was granted to New Britain by the 1950 contract, it is excluded from the 1955 contract by the terms of the "special acknowledgement" paragraph (footnote 7). If New Britain is correct in its interpretation of the "special acknowledgement" paragraph and the 1950 contract, it necessarily would follow that it would owe no royalties to Yeo et al. under the 1955 contract.

The controlling question to be determined then is whether by the 1950 contract Messrs. Hoern and Dilts relinquished and transferred to New Britain, without payment of additional royalties, exclusive rights to all inventions for which they might thereafter apply and be granted patents relating to "non-indexing, non-continuous" types of boring machines. More specifically, the question is whether patent No. 2,872,853 whose mechanisms admittedly are used in the BV machines (for which application was filed in 1953, and was pending in 1955, and which was granted in 1959) is nothing more than an improvement on the earlier patents used in the rotary-cam

7. "(2) *Special acknowledgement*—Licensor hereby acknowledges that The New Britain Machine Company has an exclusive license from Joseph H. Hoern and Carl E. Dilts, as licensors, to manufacture, use and sell products throughout the world embodying mechanisms covered by Letters Patent No. 2,641,146 dated June 9, 1953, and Letters Patent No. 2,659,-961 dated November 24, 1953, as the same relate to non-indexing and non-continuous machines, and as more particular set forth in a certain agreement dated March 28,

1946, as amended October 25, 1950, to which contract reference is hereby made for greater certainty as to the contents thereof; and Licensor further acknowledges that it is not entitled to any royalties hereunder from Licensee for any non-indexing and non-continuous machines manufactured, used or sold embodying any mechanisms within the scope of the said agreement; and Licensor further acknowledges that nothing in this agreement contained shall in any manner affect the said agreement."

actuated boring machines licensed to New Britain in 1950.

The rule for interpreting a contract assigning future patents and future improvements is well stated in De-Long Corp. v. Lucas, 176 F.Supp. 104 (S.D.N.Y.), affirmed 278 F.2d 804 (C.A. 2), cert. denied. 364 U.S. 833, 81 S.Ct. 71, 5 L.Ed.2d 58, as follows:

"It is well settled that an agreement to assign a patent and improvements thereon covers only improvements existing at the time the agreement was entered into unless the language specifically refers to future improvements. The law does not look favorably upon covenants which place 'a mortgage on a man's brain, to bind all its future products'. Aspinwall Manufacturing Co. v. Gill, C.C.D. N.J., 32 F. 697, 700. See, also Monsanto Chemical Works v. Jaeger, D.C. W.D.Pa., 31 F.2d 188; American Cone & Wafer Co. v. Consolidated Wafer Co., 2 Cir., 247 F. 335; Allison Bros. Co. v. Allison, 144 N.Y. 21, at page 29, 38 N.E. 956, at page 958. As was said in Allison, to effect an assignment of future improvements to a patent which the inventor may thereafter produce 'the language of the contract must be very plain and evidence unmistakably that such an agreement was in the mind of the inventor'." 176 F.Supp. at 127.

In Mullins Mfg. Co. v. Booth, 125 F.2d 660, 663 (C.A. 6), this court said:

"Courts of equity are loath to give their aid by construction to a contract, the enforcement of which will constitute a mortgage for life on the inventor's brain, and bind all his future products."

A contract assigning future improvements and future inventions will be enforced only where the language evidencing such an intention is clear and convincing. In Ogden v. General Printing Ink Corp., 37 F.Supp. 572, 577 (D. Md.), the court quoted with approval the following language from Williston on Contracts, Rev.Ed., vol. 5, § 1643A, page 6414:

"The governing rule in this class of cases is that where the product of an inventive mind is sought to be appropriated under an agreement to assign to another, the language of the agreement must be clear and show an unmistakable intention that the particular matter covered by the invention or patent is within the intention of the parties."

Such a contract is to be strictly construed against the grant of inventions that may be perfected in the future. Gas Tool Patents Corp. v. Mould, 133 F.2d 815, 818 (C.A. 7); Briggs v. M & J Diesel Locomotive Filter Co., 228 F.Supp. 26, 31 (N.D.Ill.), aff'd, 342 F.2d 573 (C.A. 7); cf. Gonser v. Leland Detroit Mfg. Co., 293 Mich. 196, 291 N.W. 631.

We hold that the provisions of the 1950 contract are not sufficiently clear and free from ambiguity to meet the test announced and applied in the foregoing decisions; and that the language of this contract is not so specific as to embrace *all* future inventions that might be perfected by Messrs. Hoern and Dilts relating to the broad class of *all* "non-indexing, non-continuous" boring machines. To the contrary, in granting an exclusive license to "said Rotary-Cam Actuated Boring Machines" and future improvements thereon, the 1950 contract (see language quoted in footnote 4) by its terms includes (1) "machines of the general type shown in Blue Print T-300 annexed hereto" (which concededly does not embrace Patent No. 2,872,853 here involved); and (2) "improvements thereto, as shown, described and claimed in U. S. applications, Serial No. 642,352, filed January 19, 1946, and Serial No. 671,477, filed May 22, 1946."

The first "whereas" clause in the 1950 contract (footnote 4) limits the term "improvements" on Rotary-Cam Actuated Boring Machines to "certain improvements on said machines * * * shown, described and claimed in Applications for United States Patent, Serial Nos. 642,352 and 671,477." The granting clause in-

cludes "any Letters Patent owned or controlled by Licensors, or either of them, which may be granted on applications now or hereafter filed, and disclosing improvements on or relating to said Boring Machines * * * " The term "applications * * * hereafter filed" is limited expressly to applications "disclosing improvements on or relating to *said* Boring Machines." (Emphasis supplied.)

The language of the disclosure clause of the 1950 contract is expressly limited to "any improvements in rotary-cam actuated boring machines *of the type herein licensed.*" (Emphasis supplied.)

New Britain relies on both the 1946 and 1950 contracts. The latter is the controlling instrument defining the license granted to New Britain, since it amends the former contract by rewriting it in its entirety.

It is of significance that the 1950 contract contains language that is more restrictive than the 1946 contract in several respects:

(a) The granting clause of the 1946 contract contained a provision for "disclosing improvements on or relating to said boring machines *and similar machines*". The words "and similar machines" are omitted from the 1950 contract, in which the comparable provision reads: "disclosing improvements on or relating to *said* Boring Machines." (Emphasis supplied.) The 1950 contract contains no provision requiring disclosure of improvements on or relating to "similar machines."

(b) The 1950 Contract used the term "rotary cam actuated boring machines" instead of the more general term "boring machines" used in the 1946 agreement.

(c) Another significant change between the 1946 contract and the 1950 contract is found in the disclosure clause. Under the 1946 contract, Messrs. Hoern and Dilts agreed to disclose to New Britain *"any inventions, new designs, or methods of production* in or relating to boring machines made or owned or controlled by them or either of them,"* (em-phasis supplied). Under the disclosure clause of the 1950 contract they agreed to disclose only "any improvements in rotary-cam actuated boring machines *of the type herein licensed.*" (Emphasis supplied.)

Thus, the scope of the exclusive license granted by Messrs. Hoern and Dilts to New Britain is more restricted under the 1950 contract than under the broader language of the 1946 contract. When the parties undertook to settle their dispute in 1950, they wrote more restrictive language into their revised agreement, indicating an intention not to make the exclusive grant so broad and all-inclusive as now asserted by New Britain.

■ In order to sustain its contention that Patent No. 2,872,853 comes within the scope of the exclusive license granted by the 1950 contract and accordingly that the patent whose mechanisms are used in the BV machine here in question is an exception within the special acknowledgement paragraph of the 1955 contract (footnote 7), New Britain must establish that this later patent is an "improvement on or relating to" the boring machine covered by Patents Nos. 2,641,146 (application No. 642,352) and 2,659,961 (application No. 671,477), which are the only patent applications identified as improvements to boring machines covered by the 1950 contract.

■■ Assuming that there is sufficient ambiguity on this point to permit the introduction of evidence, the burden of proof would be upon New Britain to show that Patent No. 2,872,853, whose mechanisms are used in the BV machine, is an exception under the "special acknowledgement" paragraph of the 1955 contract. In this situation, the law as to the burden of proof is that "A party who seeks advantage of an exception in a contractual stipulation as the basis of his claim is charged with the burden of proving facts necessary to bring himself within such exception." Davies Flying Service v. United States, 216 F.2d 104, 106 (C.A. 6). To like effect see 17A C.J.S. Contracts § 579, p. 1114.

While this is a contract case and not a patent case, we have read the language of the claims of Patent No. 2,872,853. These claims do not demonstrate that this patent is an improvement upon the boring machines covered by Patent Nos. 2,641,-146 and 2,659,961, the application for which is referred to in the 1950 contract. The application for Patent No. 2,872,853 makes reference to four earlier United States patents and three foreign patents by number, but no reference is made to the two applications identified in the 1950 contract.

New Britain's own advertising of the BV machine contradicts its contention that this machine is nothing more than an improvement over the boring machines licensed to it by the 1950 contract. The trade magazine "Machinery," in its November 1960 issue, published an advertisement by New Britain regarding the BV machine, containing the following language:

"Beyond a certain point, continued refinement of existing designs in machine tools ceases to make an appreciable contribution to performance. Thus in designing our New Series of Vertical Precision Boring Machines, we have incorporated several completely new design concepts to provide improved performance and greatly increase overall usefulness. * * *

"In order to take the fullest advantage of the precision inherent in cam control, long linkages between cams and slides have been eliminated. A pair of cams is mounted on a common shaft which is carried within the vertical slide. Since all slide actuating forces are contained in the vertical slide, both cams are directly adjacent to the slides they control and no outside forces are imposed on the slide ways. The result is maximum rigidity for heavy cuts coupled with extreme accuracy for close tolerance work.

"This unique and eminently workable approach to contour turning and boring results in the highest order of accuracy on even the most complex pieces. * * *"

In the issue of the trade magazine "The American Machinist" dated January 11, 1960, and March 21, 1960, New Britain described its BV machine in part as follows:

"New Britain Cam Actuated Vertical Precision Boring Machines offer an entirely new principle for more accurate boring and turning, plus compact exterior design and fast tooling. Rough cuts and finish cuts within close tolerances on the same set-up are characteristic. Standard models are available with maximum swing from 12" to 17¾" in 10 or 15 horsepower.

"Here are a few of the major new developments incorporated in these unusual machines. * * *"

Brochures issued by New Britain in 1958 and 1959 include the following language in describing the BV machine:

"This unique captive cam shaft feature, through the elimination of long actuating linkage, has resulted in an extremely compact accessible and simplified design with the obvious important advantages in maintenance and repairs."

New Britain's president testified as a witness and undertook to establish that the BV machine here involved is an improvement on the boring machines licensed by the 1950 contract. He further testified, however, that New Britain's above-quoted advertising was correct in describing the BV machine in question as offering "an entirely new principle for more accurate boring and tuning."

We reemphasize that the 1955 contract expressly mentioned Patent Application No. 400,531, filed December 28, 1953, upon which Patent No. 2,872,853 thereafter was issued, and listed it among the patents and patent applications owned by H & D Inc. This patent application is included in general terms among the "letters patent and patent rights" (footnote 6) upon which a non-exclusive license was

granted to New Britain in 1955 and for which royalties were to be paid. Since express language excluding this patent is not to be found in the "special acknowledgement" paragraph or elsewhere in the 1955 contract, we cannot assume that the parties intended to make an exception in the "special acknowledgement" paragraph as contended by New Britain. This patent application already was in existence at the time the 1955 contract was executed, having been filed two years earlier. If the parties had intended for the "special acknowledgement" paragraph to apply to this patent, assuredly they would have said so.

We hold that New Britain has not established that the BV machine here in question and Patent No. 2,872,853 come within the 1950 contract or the "special acknowledgement" paragraph of the 1955 contract. Accordingly we agree with the finding of the district court that New Britain is liable to Yeo et al. for royalties on this machine.

### 4) The amount of the judgment

Under date of December 6, 1963, following the filing of his opinion, Judge Roth entered an order stating that the court:

"Finds, in conformity with said opinion, that it was the agreement and the intention of the parties that the defendant pay royalties to Hoern & Dilts, Inc., on the 'BV' contour machine, which admittedly uses mechanisms covered by patent application number 400,531;

"The Court further finds that the rights of said Hoern & Dilts, Inc., were duly assigned to plaintiffs upon its dissolution and as former stockholders of said company;

"It is therefore, ordered that the parties shall forthwith make an accounting between them to determine the amount of royalties due to date, together with interest at the rate of 5% computed from the due date of any royalty found to be due, and this Court retains jurisdiction of this matter pending such accounting and any problems relating to it."

Pursuant to this order, on January 28, 1964, New Britain filed an accounting which was sworn to by its president. This accounting contained the figures upon which the judgment was finally entered, except for minor corrections.

After a dispute had arisen between the parties concerning the accounting, another hearing was held at which Judge Roth suggested the appointment of a master to take an accounting. Counsel for New Britain responded that "There is no need for a Master," saying:

"I think you misunderstood me when I said this was a massive job. What I was referring to as a massive job is the report which we submitted last January. This involved going into all transactions under the 1955 contract, all of our varieties of machines, their variations, the patents and patent claims. This job is not called for according to your Honor's rulings you just handed down. The job has been done as a matter of fact, all except for any machines which may have been sold since the end of 1963. As a matter of fact, one entire separate section of our report was plainly identified with BV transactions, so that job was done.

"There is no need for a Master. If it is your pleasure as you have just stated to have an accounting for the BV machines we even included a schedule of what the interest would be as your Honor requested it and that interest was specific to the BV machines. So that the job is done and we can easily undertake to complete it up to the date of this hearing today."

It was agreed that plaintiffs would send two men to the Connecticut offices of New Britain in order to facilitate the matter of accounting and avoid the necessity of appointing a master. New Britain's attorney thereafter wrote a letter to the attorneys for Yeo et al., dated July 8, 1964, stating that only a few minor errors had been found in the previous

account and "there would be a great savings of time and effort if the newly presented accounting for BV machines were merely to comprise a reproduction of the previous report." (This reference is to the sworn accounting filed January 28, 1964.) Thereupon, Yeo et al. made a report to the court as to the purported agreement of the parties in Connecticut and asked that a judgment be entered in the sum of $171,342.42 plus interest in the sum of $28,620.98.

At a subsequent hearing on September 21, 1964, extended arguments were made as to whether the judgment should be based on (1) the figures set forth in the sworn accounting filed by New Britain January 28, 1964, or (2) on the figures set forth in New Britain's "corrected accounting" hereinafter discussed. Yeo et al. contended that royalties on the BV machine should be computed at the rate of *five per cent of net sales* under Section 4(b) of the 1955 contract, which is applicable to "Hoern & Dilts" machines. New Britain contended that the correct basis of computation was *five per cent of the cost of mechanisms* under Section 4(c), which is applicable to machines other than "Hoern & Dilts" machines.

Judge Roth thereupon asked the attorney for New Britain whether, assuming the correct measure of royalties to be five per cent of net sales, as provided in Section 4(b) applicable to "Hoern & Dilts" machines, counsel would agree that the figures are accurate as set forth by New Britain in its sworn accounting of January 28, 1964, as subsequently corrected by agreement of the parties. The answer of counsel was "Yes."

█ Thus, the amount of the judgment entered by the district court is based upon figures set forth in a sworn accounting filed by New Britain and thereafter corrected and substantially verified by the parties. We hold that the district court's finding of the amount of royalties due is supported by the evidence.

### 5) The "corrected accounting"

On August 20, 1964, shortly before the judgment was entered, New Britain filed a "corrected accounting", alleging that the BV machine here involved was not a "Hoern & Dilts" machine, that New Britain had made a mistake by computing royalties at five per cent of net sales as provided under Section 4(b) for "Hoern & Dilts" machines, and that the correct amount owing under Section 4(c) of the 1955 contract was in the approximate sum of $7000, rather than the much larger sum indicated in its previous accounting.

This "corrected accounting" was not filed until after the case had been tried over a period of more than four years on the theory that the BV machine in question is a "Hoern & Dilts" machine and after the earlier accounting had been submitted by New Britain on this theory. Interrogatory No. 50, which was filed early in the proceedings, is as follows:

"Have you used any of the mechanisms embodying any of the six claims which were allowed in Patent No. 2,872,853 *on any other machine other than the so-called Hoern & Dilts machines?* If so, state upon what machines they have been used." (Emphasis supplied.)

The answer was: "No."

█ Both the original accounting and the "corrected accounting" were before the district court at the time the judgment was entered. We cannot say that the district judge erred in entering judgment upon the figures set forth in the original accounting as substantially verified by agreement of the parties, rather than accepting the "corrected accounting" based upon a belated change in New Britain's contention which was contrary to the positions and conduct of the parties throughout the trial.

### 6) New Britain's counterclaim

█ As a part of its sworn accounting of January 28, 1964, New Britain asserted that it had reexamined the entire history of its operations under the 1955 contract in the light of the opinion of the district court, and found that it had made overpayments of royalties totaling $207,-193.36.

On April 17, 1964, New Britain submitted a motion for leave to amend its answer and file a counterclaim in the amount of $207,193.36, which was denied by the district court.

The complaint of Yeo et al. was filed March 30, 1960, and New Britain's motion to amend its answer and file a counterclaim was not filed until April 17, 1964, after the prolonged trial had been completed and a decision on the merits adverse to New Britain had been announced by the district court. The record shows that at a hearing on March 16, 1962, Judge Picard inquired whether or not any counterclaim would be filed and that counsel for New Britain replied, "No counterclaim." Under these circumstances we cannot say that the district court abused its discretion in denying New Britain's motion to amend its answer and file a counterclaim so late in the proceedings. Shwab v. Doelz, 229 F.2d 749, 753 (C.A. 7); Runkle v. Nong Kimny, 105 U.S.App.D.C. 285, 266 F.2d 689, 693.

### 7) Case No. 16,211

In the second case New Britain sued Yeo et al. for the recovery of royalties alleged to have been paid by mistake and without consideration in the amount of $207,193.36. This action concededly is based upon the same contentions as outlined above with respect to its "corrected accounting" and counterclaim and seeks to recover identically the same amount as asserted in the counterclaim. Yeo et al. filed a motion to dismiss which was sustained by the district court.

We hold that the right of action which New Britain undertakes to assert by its separate action in case No. 16,211 falls within the compulsory counterclaim pro-

visions of Rule 13(a), Federal Rules of Civil Procedure.[8] The claim: (1) arises out of the transaction or occurrence that is the subject matter of the claim of Yeo et al.; (2) was matured (at least in substantial part [9]) and owned by New Britain at the time Yeo et al. served their complaint in case No. 16,287; (3) did not require for its adjudication the presence of third parties of whom the court could not acquire jurisdiction; and (4) was not, at the time the original action was commenced, the subject matter of another pending action. 1A Barron & Holtzoff, Federal Practice and Procedure, § 394 (Wright Ed.).

"This rule is mandatory. It requires that such a counterclaim be pleaded and adjudicated or else all right of action thereon is foreclosed." Ibid at p. 565.

In Southern Construction Co. Inc. v. Pickard, 371 U.S. 57, 60, 83 S.Ct. 108, 110, 9 L.Ed.2d 31, the Supreme Court said:

"The requirement that counterclaims arising out of the same transaction or occurrence as the opposing party's claim 'shall' be stated in the pleadings was designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters. The Rule was particularly directed against one who failed to assert a counterclaim in one action and then instituted a second action in which that counterclaim became the basis of the complaint. See, e. g., United States v. Eastport S. S. Corp., 2 Cir., 255 F.2d 795, 801–802."

Having failed to file a timely counterclaim in case No. 16,287 until af-

---

**8.** "(a) Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."

**9.** As to any part of the claim that matured after service of the complaint of Yeo et al., New Britain's remedy was first to have filed a timely counterclaim and thereafter to have filed supplemental pleadings. Rule 13(e), Federal Rules of Civil Procedure.

ter the district judge had announced his decision on the merits, New Britain is now foreclosed from asserting the same claim in the form of a separate action. Under the circumstances, we hold that the district court did not err in dismissing the complaint in case No. 16,211.

New Britain relies upon Rule 13(f).[10] We previously have held that the district court did not abuse its discretion in refusing to allow the filing of the counterclaim so late in the proceeding, even though earlier filing may have been due to "oversight, inadvertence or excusable neglect." After having heard and disposed of this difficult and protracted case on its merits, the district court was not required to permit New Britain to relitigate the case, either by a belated counterclaim or by a new and separate action.

We affirm the judgment in case No. 16,287 and the order dismissing the complaint in case No. 16,211.

10. "(f) Omitted Counterclaim. When a pleader fails to set up a counterclaim through oversight, inadvertence, or ex- cusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment."